WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>v.<br><br>Amy Ruth Tamborrino,<br><br>          Defendant. | No. CR-20-02615-002-TUC-JCH (EJM)<br><br>**ORDER** |

      Before the Court is the Government's Motion for Review of Release Order (Doc. 35), filed pursuant to 18 U.S.C. § 3145(a), appealing Magistrate Judge Eric J. Markovich's decision to release Defendant Amy Ruth Tamborrino ("Defendant") pretrial to Haven, a substance abuse treatment facility. Defendant opposes the Motion. (Doc. 37.) For the following reasons, the Court will deny the Motion and affirm the Release Order (Doc. 34).[1]

**I.   Background**

      On May 28, 2020, Defendant crossed into the United States on a passenger bus from Mexico. (Doc. 35 at 2.) During a search at a primary inspection point, Customs and Border Protection officers found .24 kilograms (240 grams) of fentanyl hidden on Defendant's body. (Doc. 35 at 2.) In a post-*Miranda* interview, Defendant admitted she and another passenger smuggled drugs into the United States for money. (*Id.*)

      In line with the Pretrial Services recommendation, Defendant was released pretrial

---

[1] The Court finds these matters appropriate for resolution without oral argument. *See* L.R. 7.2(f).

to Crossroads, a drug treatment facility, on June 23, 2021. (Doc. 17.) Defendant had difficulty adjusting and was placed on a behavioral contract on August 9, 2021, to address behavioral issues. (Doc. 25 at 2.) Defendant successfully completed the behavior contract and completed Crossroads' 60-day Right Track Program on August 21, 2021. (*Id.*) She was approved for a job search and secured employment as a painter on August 31, 2021. (*Id.*)

On September 31, 2021 Crossroads staff conducted a routine search of the Defendant and found a Ziploc bag containing 29 over-the-counter Acetaminophen 650 mg pills and 72 prescription Gabapentin 600 mg pills. (*Id.* at 1.) Defendant claims that she consistently forgot to take her prescribed midday dose of both medications and kept them because she did not know what to do with them. (Doc. 37 at 4.) This was a violation of Crossroads medication policy. (*See* Doc. 35-3.) Defendant was discharged from the program, apprehended by the United States Marshal Service, and temporarily detained. (Doc. 26; Doc 33 at 1.)

Defendant was screened for another treatment facility and Pretrial Services determined that the Haven would accept the Defendant for participation in their intensive outpatient program, including transitional housing, for 90 days. (Doc. 33 at 1.) However, Pretrial Services recommended detention. (*Id.* at 2.)

On October 6, 2021, United States Magistrate Judge Eric J. Markovich released the Defendant to the Haven. The Government filed a Motion to Stay Defendant's release pending the outcome of an appeal, which this Court granted. (Doc. 36.) Concurrently, the Government filed the instant Motion which seeks review of the release order and requests Defendant's pretrial detainment. (Doc. 35.)

**II.   Legal Standard**

A district court's review of a magistrate judge's detention order is de novo. *See United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The Bail Reform Act mandates the release of a person pending trial unless the court concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e). It is presumed that there are no such conditions if there is probable cause to believe that the

defendant has violated a provision of the Controlled Substances Act or the Controlled Substances Import and Export Act punishable by at least 10 years in prison. 18 U.S.C. § 3142(e)(3)(A). This presumption shifts the burden of production to the defendant, but the burden of persuasion remains with the Government. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). If a defendant proffers evidence to rebut the presumption of dangerousness or flight risk, the Court then considers four factors in determining whether to detain or a release the defendant:

> (1) the nature and circumstances of the offense charged…;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

(*Id.*; 18 U.S.C. § 3142(g).)

The Government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). A finding that a person presents a danger to the community must be proved by clear and convincing evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). Any doubts about the propriety of release should be resolved in Defendant's favor. (*Id.*) at 1405. However, the presumption against release remains, even when rebutted, and is to be considered alongside all other relevant factors. *Hir*, 517 F.3d at 1086.

### III.   Analysis

The Bail Reform Act creates a rebuttable presumption that a defendant must be detained if there is probable cause to believe that she violated a provision of the Controlled

Substances Act that is punishable by a maximum of 10 years or more. 18 U.S.C. § 3142(f)(1)(A). A grand jury's indictment is sufficient to trigger this presumption. *See Kaley v. United States*, 571 U.S. 320, 328 (2014). Based on Defendant's statements to law enforcement admitting to smuggling fentanyl into the United States for money and the grand jury's indictment, the Court finds that such probable cause exists. (*See* Doc. 35 at 2; Doc. 12.) The burden shifts to Defendant to proffer evidence to rebut the presumption of dangerousness or flight risk. Defendant offers her completion of Crossroads' 60-day Right Track Program, secured employment, and availability of suitable drug treatment placement at the Haven. (Doc. 37 at 3-5.) Because this is sufficient to rebut the presumption, the Court considers the four Bail Reform Act factors.

### A. Bail Reform Act Factors

#### 1. Nature and Circumstances of the Offense

Defendant is charged with: 1) one count of Conspiracy to Possess with Intent to Distribute Fentanyl pursuant to 21 U.S.C. § 846; 2) two counts of Possession with Intent to Distribute Fentanyl pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi); 3) one count of Conspiracy to Import Fentanyl pursuant to 21 U.S.C. § 963; and 4) two counts of Importation of Fentanyl pursuant to 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(2)(F). Each count involves a controlled substance, a serious crime identified in 18 U.S.C. § 3142(g).

The Court may consider the possible punishment and the incentive to flee associated with a defendant's criminal exposure. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (noting that the defendants faced a greater penalty after being charged with multiple counts with possible maximum sentences that could be served consecutively, which provided a greater incentive to consider flight).

Here, the nature and circumstances of the offense favor detention. First, the possible punishment provides an incentive to flee. Like the *Townsend* defendants who faced multiple charges, Defendant is also charged with multiple offenses with maximum sentences. The nature of this offense, though non-violent, involves a controlled substance which has caused "extraordinary damage in the community." (Doc. 35 at 4.) On balance, this factor weighs against Defendant.

### 2. Weight of the Evidence Against Defendant

The weight of the evidence is the least important factor that the Court considers and is not a pretrial determination of guilt. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir.1985); *Townsend*, 897 F.2d at 994. Here, the fact that Defendant came across the border with fentanyl concealed on her body coupled with Defendant's statements during a post-*Miranda* interview, wherein she admitted to doing so in exchange for money, weigh against Defendant. (*See* Doc. 35 at 2.)

### 3. History and Characteristics of Defendant

The Defendant is a 41-year-old woman who has resided in Arizona since 2005. (Doc. 15 at 2.) She is a U.S. citizen, traveled to Mexico once in 2020, and does not possess a U.S. passport. (*Id.*)

The Government argues that the Defendant's history and characteristics "weigh heavily in favor of detention." (Doc. 35 at 5.) First, the Government states that the Defendant's living situation is unverified. (*Id.*) Defendant asserted that she has lived in the same apartment in Phoenix with her boyfriend, Elmer Duarte, for the past year. (Doc. 15 at 2; Doc. 37 at 3.) Though Mr. Duarte did not confirm a romantic relationship nor Defendant's address, he expressed a willingness to serve as a third-party custodian and to allow Defendant to live with him if needed. (Doc. 15 at 2; Doc. 37 at 3.) While the Government correctly points out that the Defendant and Mr. Duarte provided inconsistent information, Mr. Duarte and the Defendant both provided that the Defendant would have a home with Mr. Duarte if released.

Additionally, Defendant has significant ties to Arizona. Though her parents and three siblings reside in Colorado, one sibling, her boyfriend,[2] and her 13-year-old son all reside in Arizona. (Doc. 15 at 2; Doc 37 at 3.) Importantly, Defendant asserts that she has begun to repair her relationship with her son. (Doc. 37 at 4.) She also has had sporadic

---

[2] The Defendant informed Pretrial Services on Mary 26, 2021 that Mr. Duarte was her boyfriend. *See* Doc. 15 at 2. At that time, Mr. Duarte stated he and the Defendant are only friends. *Id.* However, the Defendant again referred to Mr. Duarte as her boyfriend on Oct. 12, 2021. *See* Doc. 37 at 3.

employment in Arizona[3] and secured a job as recently as August 31, 2021 where she worked as a painter until her pretrial release was revoked. (Doc. 15 2-3; Doc. 37 at 4.) Taken together, Defendant's history and personal ties weigh against a finding of risk of flight.

Defendant has a concerning physical and mental health history. First, she suffers from asthma and neuropathy for which she is prescribed gabapentin and albuterol. (Doc. 15 at 3.) She also has a history of panic disorder and attention deficit hyperactivity disorder; Mr. Duarte claimed during the Pretrial Services interview that Defendant was participating in court-ordered anger management classes. (*Id.*)

The Defendant also has an extensive history of drug use. Defendant first consumed alcohol at age 12 and, at the time of arrest, was consuming 12 beers daily. (Doc. 15 at 3.) At the time of arrest, she was using methamphetamine, heroin, and fentanyl daily and had been doing so for one month. (*Id.*) She first used methamphetamine at age 15, heroin at 35, and fentanyl at 38. (*Id.*) Despite the longevity of Defendant's addiction, she also has a history of maintaining sobriety for significant time periods. She was sober for 10 years from ages 25 to 35. (*Id.*) She also was sober for six months prior to the month before arrest. (*Id.*)

The Defendant has a lengthy criminal history. Defendant has been arrested 18 times since 1999. (Doc. 16 at 2-5.) The majority of the charges brought against Defendant pertain to possession of substances and shoplifting. (*Id.*) None of these drug-related charges pertained to drug trafficking or smuggling drugs. Over half of the charges did not result in convictions. (*Id.*) Most of Defendant's criminal history is non-violent, but she was charged with assault or other crimes against a person in 2001, 2003, and 2019. (*Id.*) Defendant served 10 days in jail for the 2019 offense, the maximum sentence she has served. (*Id.*) There is presently a case pending in Scottsdale City Court against Defendant for threatening injury to property, shoplifting, and resisting arrest. (*Id.* at 5.) Lastly, Defendant

---

[3] There is inconsistency between Defendant's report (that she worked part-time for Mr. Duarte most recently and as a painter before that) and Mr. Duarte's report (that Defendant was most recently unemployed and performing odd jobs in painting). *See* Doc. 15 at 2-3; Doc. 35 at 5.

failed to appear on charges of failure to pay fare and failure to provide identification in 2019; she was twice charged with failure to appear in 2017 and both counts were dismissed. (Doc. 16 at 2.)

Defendant's history of drug use, criminal history, and past failures to appear for court raise concern. However, Defendant also has a history of sobriety and appearing in court. This is underscored by Defendant's request to be released into treatment rather than into the community. Conditions of release, discussed below, require the Defendant to resolve all pending court matters and participate in substance abuse, alcohol, and mental health treatment. The Government argues that this is not enough because Defendant already has failed treatment at Crossroads. Yet, Defendant did in fact complete several distinct portions of treatment—she completed 12 steps of her 12-step program (Doc. 37 at 4) and the 60-day Right Track Program (*Id.* at 3). She did not fail *treatment*, rather, she failed to comply with the facility's medication policy. (Doc. 35 at 6; *see* Doc. 35-3.) The Court acknowledges that these policies are in place to ensure the safety of facility patients and ensure program adherence. However, the Court also appreciates the difficulties associated with overcoming addiction and recognizes that the road to recovery is not linear.

Considered together, the Defendant's history and characteristics, including family ties, employment, substance use history, and criminal history, weigh neither in favor of the Defendant nor the Government.

### 4. Dangerous Nature

The Government argues that Defendant poses a danger to the community that cannot be mitigated by any conditions of release. (*See generally* Doc. 35.) Congress was aware of the dangerousness of drug trafficking when passing the Bail Reform Act of 1984:

> The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.... The Committee also emphasizes that the risk a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.

S.Rep. at 12-13, 1984 U.S. Code Cong. & Adm. News, 3195; *see also United States v. Bolivar*, 455 F. Supp. 3d 1165, 1170-71 (D.N.M. 2020). This danger has been recognized

by courts which have denied pretrial release in fentanyl trafficking cases. *See, e.g.*, *United States v. Villot-Santiago*, 502 F. Supp. 3d 579, 580 (D. Mass. 2020); *United States v. Taylor*, 449 F. Supp. 3d 668, 673 (E.D. Ky. 2020) ("It is beyond dispute that distributing narcotics is a serious offense that poses dire health risks to the community—and the risks associated with fentanyl specifically are even greater."). The Court agrees—where there is a serious danger that the defendant will continue to introduce drugs, violence, and disruptive behavior into the community, such a danger warrants detention. Therefore, "when determining whether to detain [the] defendant the court must, in essence, make a prediction as to whether [the] defendant is likely to traffic in illicit drugs if released pending trial based on, inter alia, the factors prescribed by the Bail Reform Act." *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007).

The degree of trafficking risk here pales in comparison to other cases where a court denied pretrial release to a defendant facing charges involving an alleged intent to distribute narcotics. First, the Defendant had 240 grams of fentanyl on her person when arrested; this quantity falls below other cases that ordered detention based upon danger for continued trafficking. *See United States v. Medina-Bejar*, No. 2001157MJ001PHXJFM, 2020 WL 4462203, at *2 (D. Ariz. June 18, 2020) (40 pounds of methamphetamine (approximately 18,143.6948 grams)); *United States v. Terrones*, 712 F. Supp. 786, 788 (S.D. Cal. 1989) (737 pounds of cocaine (approximately 334,297.576 grams)); *Villot-Santiago*, 502 F. Supp 3d at 580 (100 grams or more of heroin, 400 grams or more of fentanyl, 280 grams or more of cocaine base, and 500 grams or more of cocaine). Second, while Defendant has a lengthy history of substance abuse, she has no known prior history of drug trafficking. *Contra United States v. Mahan*, 454 F. Supp. 3d 939, 941 (D. Idaho 2020) (detainee had been charged with, and convicted of, multiple serious crimes of violence and drug trafficking in a repeating pattern over 16 years). Indeed, Defendant's only known convictions are for shoplifting, drug and paraphernalia possession, and one count of domestic violence assault. (Doc. 15 at 4-7.) None of these occurred while Defendant was on any sort of court supervision. *Contra Gibson*, 481 F. Supp. 2d at 423 (defendant had history of continuing to engage in the trafficking of illicit drugs despite being on court supervision). Third, there

is no showing that Defendant was engaged in any sort of organized or sophisticated drug-smuggling operation. *Contra United States v. Perez-Lugo*, 979 F. Supp. 2d 197, 199, 202 (D.P.R. 2013) (noting that drug traffickers with ties outside the U.S. have the resources to flee in case involving conspiracy to coordinate 19 drug transport operations); *United States v. Jones*, 804 F. Supp. 1081, 1089 (S.D. Ind. 1992) (sophisticated drug operation demonstrating knowledge of federal narcotics laws, drug delivers arranged through pager system, and false identities warranted detention).

The degree of risk of general danger also appears to be much less than other cases finding for detention. Defendant did not have a weapon on her at the time of arrest nor does she have any history that indicates possession of weapons. *Contra United States v. Torres*, 995 F.3d 695, 699 (9th Cir. 2021) (possessing two rounds of ammunition on him at the time of arrest and a history of assault with deadly weapon, prisoner in possession of a weapon, and possession of brass knuckles); *United States v. Villot-Santiago*, 502 F. Supp. 3d 579, 583 (D. Mass. 2020) (a significant amount of money was found in Villot-Santiago's bedroom together with a nearby loaded gun at the time of arrest); *United States v. Cox*, 449 F. Supp. 3d 958, 960 (D. Nev. 2020) (charged with armed bank robbery and with possessing a firearm during and in relation to a crime of violence). Defendant does not appear to have any ties to dangerous groups. *Compare United States v. Rodriguez*, 147 F. Supp. 3d 1278, 1291 (D.N.M. 2015) (noting that Defendant was not a high-ranking officer in a drug cartel and was not likely a danger) *with United States v. Ward*, 63 F. Supp. 2d 1178, 1181 (C.D. Cal. 1999) (patch defendant wore showed that he held himself out as one who had killed for motorcycle gang); *United States v. Cole*, 465 F. Supp. 3d 1175, 1178 (W.D. Wash. 2020) (ties to an extremist organization).

Though the Government briefly addresses the dangerousness of fentanyl, it does so in the evaluation of the nature of the offense, not the dangerousness of the Defendant herself. (*See* Doc. 35 at 4.) Instead, the Government focuses its dangerousness analysis on, and only mentions "trafficking" in relation to, Defendant's Ziploc bag of 29 acetaminophen pills and 72 Gabapentin pills. (Doc. 35 at 6-7.) The parties dispute the addictive qualities of gabapentin. (*Compare* Doc. 35 at 6 (Gabapentin "produces a pleasurable high and does

not show up on standard drug tests") *with* Doc. 37 at 4 ("Scientific review of gabapentin found that it was rarely addictive in the general population, and of low toxicity.")) This disagreement is mirrored in the scientific community. *Compare* Doc. 38 (A mini-review of gabapentinoids' addictive power supporting the view that gabapentinoids are rarely addictive); U. Bonnett & N. Scherbaum, *How Addictive are Gabapentin and Pregabalin? A Systematic Review*, 27 EUROPEAN NEUROPSYCHOPHARMACOLOGY 1185, 1185 (2017) (same) *with* Kirk R. Evoy et al., *Abuse and Misuse of Pregabalin and Gabapentin: A Systematic Review*, 81 Drugs 125, 125 (2021) (finding that gabapentinoids are abused and produce desirable effects). Since the experts are unable to determine this issue, the Court will not evaluate the dangerousness to the community posed by Defendant's accumulation and possession of this medication.

The mere hoarding of medications is problematic because it demonstrates a possible danger and an unwillingness to comply with treatment facility rules. However, aside from the Government's assertion that it is unlikely that Defendant simply forgot the medication, there is no clear and convincing showing of danger to the community. There is no showing that the Defendant shared or sold medication nor is there a showing that she intended to do so. There is no showing that Defendant carelessly left the medication out for others to access or that the Defendant herself was misusing the medication; in fact, the number of pills contained in the Ziploc bag does not support an assertion that this medication was being abused.

These factors, the dangerousness of fentanyl, the lack of aggravating factors supporting a dangerous drug smuggling operation, and the hoarding of gabapentin, considered weigh neither in favor of the Government nor the Defendant.

### B. Conditions of Release

A person facing trial is entitled to release under the least restrictive conditions that will reasonably assure the appearance of the person and should only be denied in rare circumstances. *Motamedi*, 767 F.2d at 1405. Even in the presence of risk, a defendant must still be released if there are conditions of release that may be imposed to mitigate the flight risk or risk to the community. *See* 18 U.S.C. § 3142(e). Any doubts about the propriety of

release should be resolved in Defendant's favor. *Motamedi*, 767 F.2d at 1405.

Though Defendant's history of drug use and criminal activity raises concern about risk of nonappearance, Defendant had the opportunity to flee when she was leaving the Crossroads treatment facility to work and did not. Importantly, the Defendant is to be released into intensive outpatient treatment. *Compare with United States v. Hir*, 517 F.3d 1081, 1092-93 (9th Cir. 2008) (noting that a critical flaw of proposed conditions of release were that they solely depended on the Defendant's own volition and good faith compliance).

The Government has not argued *why* these imposed conditions would fail to reasonably assure the appearance of the Defendant. Instead, the Government argues that the conditions would not mitigate a risk to the community. Again, the Government does not explain why the conditions, specifically at Haven, would fail to mitigate any risk to the community. The Defendant asserted that her failure to comply with Crossroads' rules was a mistake. The Government in turn argues that this was willful and a demonstration of inability to comply with future treatment. Without more, these opposing arguments produce doubt and where there is doubt about the propriety of release, it must be resolved in favor of the Defendant.

…

…

…

IV. **Order**

After a de novo review, the Court concludes that the Government has failed to prove by clear and convincing evidence that the Defendant presents a risk to the community that cannot be mitigated by the proposed conditions of release. Accordingly,

**IT IS ORDERED DENYING** the Government's Motion (Doc. 35) and affirming the release order.

**IT IS FURTHER ORDERED SETTING** a status conference on **Friday, October 29, 2021 at 10:15 a.m. in Courtroom 3C** before Magistrate Judge Eric J. Markovich. Defendant is to be released contingent upon bed space availability at the Haven and subject to the pretrial release conditions outlined in Judge Markovich's October 6, 2021 release order.

Dated this 26th day of October, 2021.

_____
Honorable John C. Hinderaker
United States District Judge